UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAVID K. DONOVAN, JR., and<br>DAVID R. HINKLE,<br><br>Defendants. | Civil Action No.<br><br>JURY TRIAL<br>DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### PRELIMINARY STATEMENT

1. During the period from July through September 2003 (the "relevant period"), Defendants David K. Donovan, Jr. ("Donovan"), then an equity trader at FMR Co., Inc., a wholly-owned subsidiary of Fidelity Management & Research Company (collectively, "Fidelity"), and David R. Hinkle ("Hinkle"), then a registered representative at Capital Institutional Services, Inc. ("Capital Institutional Services"), defrauded Fidelity and its advisory clients, including the Fidelity Funds, by gaining access to confidential trading information stored on Fidelity's internal order database, by learning that Fidelity's advisory clients, including the Fidelity Funds, were purchasing and intended to continue purchasing for its advisory clients a substantial amount of the common stock of Covad Communications Group, Inc. ("Covad"), by using that confidential information concerning Fidelity's pending securities orders to trade on and ahead of Fidelity's securities orders for the stock of Covad, by failing to disclose to Fidelity and its clients that they were trading on and ahead of those orders, and by profiting thereby.

2. During the relevant period, Covad was a Delaware corporation headquartered in San Jose, California. Covad's common stock was registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)]. Shares of Covad common stock were traded on the OTC Bulletin Board.

3. During the relevant period, Donovan accessed Fidelity's internal order database on approximately 107 occasions and obtained confidential information that Fidelity was purchasing and intended to continue purchasing for its advisory clients a substantial amount of Covad common stock.

4. Donovan also requested authorization from Fidelity to trade Covad stock in his personal account during the same period, and was denied.

5. During the relevant period, Donovan viewed Fidelity's pending Covad orders using the internal order database, communicated with Hinkle, disclosed confidential trading information of Fidelity and its advisory clients, and, shortly thereafter, Hinkle purchased the stock.

6. In addition, after viewing Fidelity's orders and being denied permission to buy Covad stock, Donovan caused purchases of the stock to be made in the account of his mother ("Donovan's mother"), who is a resident of Marblehead, Massachusetts.

7. Neither Hinkle nor Donovan's mother had purchased Covad stock prior to the relevant period, and Donovan's mother's account had been inactive for two years prior to the Covad purchases.

8. Profits accrued to both Hinkle and Donovan's mother's account when they sold out positions in Covad in the weeks following the purchases made during the relevant period.

The Defendants defrauded Fidelity and its advisory clients by gaining access to confidential trading information stored on Fidelity's internal order database, by learning that Fidelity was purchasing and intended to continue purchasing for its advisory clients a substantial amount of the common stock of Covad, by using that confidential information concerning Fidelity's pending securities orders to purchase Covad's stock for profit and trade ahead of Fidelity's securities orders, by failing to disclose to Fidelity and its clients that they were trading on the confidential information of Fidelity and its advisory clients as well as "trading ahead" of their orders, and by profiting thereby.

9. By engaging in the conduct alleged in this Complaint, Defendants Donovan and Hinkle violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

10. Unless restrained and enjoined, Defendants are likely to commit further violations in the future. The Commission seeks entry of permanent injunctions prohibiting Defendants from further violations of the relevant provisions of the federal securities laws. The Commission also seeks disgorgement of Defendants' ill-gotten gains and unjust enrichment, plus pre-judgment interest, and the imposition of civil monetary penalties.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa]. The Commission seeks the imposition of civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Many of the acts and transactions constituting violations occurred within the District of Massachusetts.

**DEFENDANTS**

12.     Donovan, age 45, is a resident of Marblehead, Massachusetts. Donovan was an equity trader at Fidelity from 1992 until he was forced to resign in March 2005 after some of the conduct that forms the basis for this Complaint came to light. At all times during the relevant period, Donovan was a sector trader specializing in technology stocks, and he was also a team leader for a group of several sector traders. At all times during the relevant period, Donovan was licensed with the Financial Industry Regulatory Authority ("FINRA") and/or its predecessor, the National Association of Securities Dealers.

13.     Hinkle, age 35, is a resident of Austin, Texas. Hinkle was a registered representative working with broker-dealer Capital Institutional Services as an institutional sales representative from July 1996 to April 2004. Hinkle is currently a registered representative through FINRA with MKM Partners, LLC, a broker-dealer located in Austin, Texas. From 1999 through September 2003, Hinkle was responsible for covering Capital Institutional Services' institutional sales trading business with Fidelity. In this role, Hinkle covered Fidelity's entire equity trading desk and had extensive and substantial contacts with Fidelity's equity traders in Massachusetts.

**OTHER PARTIES**

14.     Fidelity Management & Research Company ("FMR") is a privately-held Massachusetts corporation registered with the Commission as an investment adviser pursuant to Section 203(c) of the Investment Advisers Act of 1940, with its principle place of business in Boston, Massachusetts. FMR is an adviser to various institutional clients and has approximately $1.25 trillion in assets under management. FMR's institutional clients include a group of

approximately 350 registered investment companies marketed under the "Fidelity Investments" trade name and managed by FMR and its affiliates (hereafter, the "Fidelity Funds").

15. FMR Co., Inc. ("FMR Co.") is a wholly-owned subsidiary of FMR. FMR Co. is also a privately-held Massachusetts corporation registered with the Commission as an investment adviser pursuant to Section 203(c) of the Advisers Act, with its principal place of business in Boston, Massachusetts. FMR Co. provides portfolio management services as a sub-adviser to certain clients of FMR, including the Fidelity Funds.

## DETAILED ALLEGATIONS

### Donovan Knew that Fidelity's Code of Ethics Prohibited Him from Trading Ahead of Fidelity's Securities Orders

16. During the relevant period, Donovan was an equity trader at Fidelity responsible for placing trades with institutional sales representatives in technology securities based on the confidential instructions of various Fidelity portfolio managers and advisory clients.

17. Throughout Donovan's employment with Fidelity, Fidelity maintained a "Code of Ethics for Personal Investing" (the "Code of Ethics").

18. As a trader employed on Fidelity's equity trading desk, Donovan annually signed an acknowledgement of his receipt and understanding of Fidelity's Code of Ethics.

19. Under the heading "PROHIBITIONS," the Code of Ethics stated, "Using your knowledge of fund transactions to profit by the market effect of such transactions is prohibited." The Code of Ethics required, among other things, that all employees maintain their personal brokerage accounts at Fidelity. The Code of Ethics further required that employees with access to confidential trade information pre-clear all securities trades with Fidelity's ethics office.

According to the Code of Ethics, "[g]enerally, a pre-clearance [would not] be approved if it [was] determined that the trade [would] have material influence on the market for that security or [would] take advantage of, or hinder, trading by the funds."

### Donovan Accessed Confidential Information Regarding Fidelity's Covad Orders and Obtained Confidential Information Regarding Fidelity's Pending, Unexecuted Securities Orders For Its Advisory Clients

20. Because of his position at Fidelity, during the relevant period Donovan had access to Fidelity's internal trade database, which allowed him to obtain confidential information regarding Fidelity's pending, unexecuted securities orders for its advisory clients.

21. Information on Fidelity's internal trade database relating to pending orders is confidential, non-public information. Fidelity protects the confidentiality of this trading information by keeping it on an internal, secure, password-protected computer database. As part of Donovan's employment agreement with Fidelity, he acknowledged that Fidelity's trading information constituted "Confidential Information" and that such confidential information would be imparted to him "in a relationship of confidence."

22. Fidelity provided its traders, including Donovan, access to the trade database by means of a secure and unique identification number. This access was not, however, unfettered. Donovan's employment agreement provided that he would not disclose confidential information unless necessary to carry out his job, necessary to carry out the duties and responsibilities of another Fidelity employee or agent, or authorized in writing by Fidelity. Moreover, Dovovan's employment agreement included a pledge that he would "adhere to" the Code of Ethics described above.

23. Each time Donovan used the internal database a record was made that indicated

his unique identification number, the time and date of the access, and the name of the security searched.

24.     Although Donovan was not responsible for or involved with trading Covad stock on behalf of Fidelity, and had no legitimate business reason for doing so, throughout the relevant period, Donovan accessed information about Covad stock in Fidelity's trade database.

### Donovan Provided Hinkle With Confidential Information Regarding Fidelity's Pending, Unexecuted Securities Orders For Its Advisory Clients and Hinkle Purchased Covad Stock Relying on That Information

25.     During the relevant period, Hinkle was a registered representative at Capital Institutional Services, a broker-dealer located in Dallas, Texas.

26.     Donovan frequently directed trades cumulatively totaling millions of shares on behalf of Fidelity's advisory clients to Hinkle for execution, which resulted in millions of dollars in commission compensation to Hinkle's firm in the 2002 through September 2003 timeframe alone.

27.     During the period 2002 through at least September 2003, Hinkle provided to Donovan and expensed to his firm tens of thousands of dollars' worth of travel and entertainment, including approximately 12 trips involving air travel, some of which was by private jet. This travel and entertainment included trips to a National Football League Super Bowl, golfing at Pebble Beach in California, and trips to international tennis tournaments such as Wimbledon and the French Open.

28.     Hinkle and Donovan had a close working and social relationship. They sometimes took their wives together on the travel and entertainment events described in the preceding paragraph. They also frequently communicated, including about securities for their

personal accounts.

29. From July 8, 2003 to August 15, 2003, Hinkle bought a total of 75,000 shares of Covad stock for his personal account on six separate dates.

30. Prior to July 2003, Hinkle had not previously purchased any stock in Covad. Hinkle knew that it would not be appropriate for him to buy a security if he knew that Fidelity had substantial orders pending to purchase that stock, particularly in the context of a thinly-traded security. Nonetheless, Hinkle purchased the majority of those shares shortly after receiving confidential information from Donovan regarding Fidelity's pending orders to purchase Covad stock.

31. On July 8, 2003, Fidelity's pending order database held pending orders to purchase Covad stock in amounts ranging between 150,000 and 602,700 shares. On this day, Donovan accessed Fidelity's pending order database concerning Covad on nine separate occasions.

32. Donovan accessed Fidelity's pending order database on July 8, 2003 at approximately 10:01 a.m. At or near this time, Fidelity had pending orders to purchase 250,000 shares of Covad stock.

33. At approximately 10:25 a.m. on July 8, 2003, Hinkle and Donovan spoke by telephone.

34. Between approximately 10:25 a.m. and 1:55 p.m., Donovan accessed Fidelity's pending order database for Covad seven more times. At approximately 1:54 p.m. on July 8, 2003, Donovan sought pre-clearance from Fidelity's ethics office to purchase 50,000 shares of Covad for his personal account, but was denied two minutes later due to the Fidelity Funds'

activity in the stock.

36. Donovan accessed Fidelity's pending order database one more time on July 8, 2003 at approximately 3:07 p.m. At approximately 3:30 p.m. on July 8, 2003, Hinkle purchased 15,000 shares of Covad in his personal account at prices between $0.92 and $0.96 per share.

36. At the time of these purchases, Hinkle knew that Fidelity planned to purchase Covad and had obtained that information from Donovan. Hinkle sent emails to colleagues evidencing his knowledge of Fidelity's planned purchases of Covad. For example, at approximately 8:53 a.m. the next morning (July 9, 2003), Hinkle sent an electronic message to a friend, a registered representative, stating: "covd-beantown large buyer." Hinkle's friend replied by asking: "u telling me I need to pick up some covd?" Hinkle replied by stating: "buy covd-lots of it."

37. On July 9, 2003, Hinkle also suggested to two other co-workers via email that they buy Covad.

38. On July 16, 2003, Hinkle purchased approximately 5,000 shares of Covad stock. On July 21, Hinkle purchased approximately 10,000 shares of Covad stock.

39. During July 9, 2003 through September 30, 2003, Donovan continued to access Covad on Fidelity's database and communicate with Hinkle.

40. On July 31, 2003 at approximately 9:27 a.m. and 10:15 a.m., Donovan accessed Covad on Fidelity's database, at which times Fidelity had pending limit orders to purchase 100,100 shares of Covad.

41. On July 31, 2003, Hinkle purchased 20,000 shares of Covad at approximately 10:48 a.m.

9

42. On August 1, 2003, Donovan accessed Covad on Fidelity's database seven times and spoke with Hinkle at least twice.

43. Hinkle also wrote Donovan an email on August 1, 2003 that stated "covd."

44. On the morning of the next business day, August 4, 2003, Hinkle purchased 10,000 shares of Covad. Eleven days later, on August 15, 2003, Hinkle purchased 15,000 more shares of Covad stock.

45. On August 19 and 26, 2003, Hinkle sold his shares of Covad stock acquired between July 8 and August 15, and reaped a profit in the approximate amount of $141,035.

### While in Possession of Confidential Information, Donovan Caused Purchases of Covad Stock Through His Mother's Account

46. In the three days from August 5, 2003 to August 7, 2003, 55,000 shares of Covad stock were purchased in a brokerage account at Fidelity Investments in the name of Donovan's mother.

47. Between August 4 and 7, 2003, Fidelity processed large orders to buy Covad stock for the Fidelity Funds, resulting in outstanding orders to buy: 1,966,400 shares of Covad stock at the end of the day on August 4; 916,000 shares at the end of the day on August 5; 408,800 shares at the end of the day on August 6; and 100,100 shares at the end of the day on August 7.

48. Starting on August 4, 2003 through August 7, 2003, there were a series of instances in which Donovan obtained Fidelity's confidential trading information on Covad stock stored on Fidelity's database, Donovan communicated with someone at his parents' home, and then, Donovan's mother's account purchased Covad.

49. At approximately 10:54 a.m. on Monday, August 4, 2003, Donovan, who was not

at work, placed a call from his cell phone to the Fidelity trading desk.

50.     At that approximate time, Jeffrey Harris, another Fidelity trader and a friend of Donovan's who was working on the trading desk that morning, accessed Covad in Fidelity's database. Donovan frequently called Harris to request disclosure of Fidelity's confidential trading information for stocks that Donovan had purchased for his personal trading account.

51.     At approximately 11:56 a.m. on August 4, 2003, a limit order for 5,000 shares of Covad stock at $1.30 was placed in Donovan's mother's account.

52.     At approximately 3:02 p.m. on August 4, 2003, the limit order for Covad in this account was canceled, and two minutes later a limit order to purchase 5,000 shares of Covad at $1.45 was placed in the account.

53.     At approximately 3:22 p.m. on August 4, 2003, another limit order was placed in the account for 2,000 shares of Covad at $1.45. By the end of the day on August 4, 2003, Fidelity had pending orders to buy more than 1.9 million shares of Covad stock for the Fidelity Funds.

54.     At approximately 7:48 the next morning (August 5, 2003), Donovan accessed Fidelity's database, at which time Fidelity had pending orders to buy 1,966,400 shares of Covad stock.

55.     Minutes later at approximately 7:53 a.m. on August 5, 2003, Donovan placed a three-and-a-half-minute telephone call to his parents' house. Several minutes after that, the limit order for 5,000 shares of Covad placed the day before (but not yet executed) in his mother's account was canceled and replaced with a market order for the same number of shares.

56.     On August 6, 2003, between approximately 8:54 and 9:08 a.m., Donovan

11

accessed Covad on Fidelity's database. At approximately 9:12 a.m. on August 6, a market order for 25,000 shares of Covad was placed in his mother's account. At approximately 9:24 a.m., on August 6, Donovan placed a telephone call to his parents' home. At approximately 9:27 a.m. on August 6, the prior market order for 25,000 shares of Covad was canceled in his mother's account. At approximately 9:34 a.m. on August 6, a market order for 25,000 shares of Covad was placed in Donovan's mother's account. At approximately 1:41 p.m. on August 6, Donovan accessed Covad on Fidelity's database. On August 7, 2003, at approximately 11:02 a.m., a limit order for 25,000 shares of Covad was placed in Donovan's mother's account.

57.     During the period between August 5 and 7, 2003, a total of 55,000 shares of Covad were purchased in Donovan's mother's brokerage account at prices ranging from $1.68 to $1.86, and at a total cost of $97,225.

58.     When those 55,000 shares of Covad were sold on September 5, 2003 at $3.40 per share, Donovan's mother's brokerage account profited in the amount of approximately $89,775.

59.     Donovan, through his actions, caused Covad stock to be purchased through his mother's trading account in 2003. Donovan engaged in these actions knowingly and with the purpose of causing his mother's account to profit from the acquisition of Covad stock on Fidelity's confidential information and ahead of Fidelity's pending securities trades.

60.     Investment advisory firms, such as Fidelity, and their clients have an expectation that the employees of these investment advisory firms will not communicate client order information to someone who plans to trade based on that information, and will not, themselves, trade on that information. Moreover, Fidelity policy expressly prohibited its employees from using knowledge of Fidelity's trades for personal benefit.

61.     Donovan knew that he was obligated to refrain from disclosing Fidelity's pending orders to individuals outside of Fidelity and that it was in fact unlawful for him to disclose Fidelity's pending orders to others outside of Fidelity. Fidelity and Fidelity's clients would have wanted to know that Donovan was obtaining access to their confidential order information for the purpose of personally benefiting by trading on and ahead of those orders.

62.     Donovan breached his duty to Fidelity and its clients by misappropriating confidential information concerning Fidelity's plans to purchase Covad stock, by using that information to cause trading in his mother's personal trading account, and by disclosing the confidential information to Hinkle.

63.     As an institutional sales representative servicing Fidelity for several years, Hinkle knew or was reckless in not knowing that Donovan breached a duty to Fidelity and its advisory clients by disclosing confidential information concerning Fidelity's pending securities orders. Hinkle used that confidential information for his own benefit, to the potential injury of his customer, Fidelity, and Fidelity's clients.

64.     Execution of a large Fidelity order for a low-priced stock, such as Covad, had a strong potential to affect the stock's price, and, therefore, that information concerning such an order was material. As a licensed securities professional, whose customers included Fidelity and other institutional customers, Hinkle would be well aware that of this fact. During investigational testimony, Hinkle in fact testified that it would not be appropriate for him to buy a security for his own account if he knew that Fidelity had substantial orders pending to purchase that stock, particularly in the context of a thinly-traded security.

65.     During the relevant period, neither Donovan, nor Hinkle, disclosed the above

conduct to Fidelity or its clients. The Defendants' failure to disclose their conduct to Fidelity and its clients was a material omission.

## CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

66. The Commission repeats and incorporates by reference the allegations in paragraphs 1-65 of the Complaint as if set forth fully herein.

67. Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

68. As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission requests that this Court:

A. Enter permanent injunctions restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. '240.10b-5];

B. Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus pre-judgment interest;

C. Order Defendants to pay appropriate civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D. Award such other and further relief as the Court deems just and proper.

Plaintiff hereby requests that this matter be tried before a jury.

Respectfully submitted,

*/s/ R.M. Harper II*
Richard M. Harper II (BBO# 634782)
harperr@sec.gov
Martin F. Healey (BBO #227550)
healeym@sec.gov
Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street; 23rd Floor
Boston, MA  02110
(617) 573-8979 (Harper)
(617) 573-8952 (Healey)
(617) 573-4590  fax

April 16, 2008