UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 1:08-CV-10649-RWZ |
| DAVID K. DONOVAN, JR. and DAVID R. HINKLE, | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF DAVID HINKLE'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

The Securities and Exchange Commission ("SEC") alleges that on eight occasions in July and August of 2003, David Hinkle bought or sold the common stock of Covad Communications Group ("Covad") because he had learned from David Donovan ("Donovan"), who was then a trader at Fidelity Investments ("Fidelity"), that Fidelity was about to buy or sell that same security. The SEC contends that Fidelity's investment decisions were likely to affect the market and, it claims, by "trading ahead" of Fidelity, Hinkle improperly profited. Summary judgment should enter for Hinkle for three reasons.

First, the evidence that the SEC offers to support its contention that Hinkle knew about the Fidelity orders is improperly speculative. The only "confidential information" that Hinkle is alleged to have misappropriated is information about Fidelity's orders to buy and sell Covad stock, which was changing at least *daily*. Because it is undisputed that Hinkle did not have direct access to that information (the SEC alleges that Donovan told Hinkle about it on the telephone), the SEC must rely on what amounts to three types

of evidence from which it would like a jury to jump to conclusions about Hinkle's scienter: (a) Hinkle's trades; (b) telephone calls between Hinkle and Donovan; and (c) a single instant message that Hinkle sent to a friend on July 9, 2003. As detailed below, there is nothing about Hinkle's trading that suggests he knew what Fidelity was about to do. In fact, his trades came *after* Fidelity's (that is, after Fidelity's intentions were well known to the market) or they were, in whole or in part, contrary to Fidelity's (he bought when Fidelity sold, or vice versa). Similarly, the phone records demonstrate nothing from which a jury could infer the transmittal of confidential information. On four of the days that Hinkle traded during this period, there is no evidence of any call with Donovan. On two (of the four) dates when Donovan and Hinkle did speak, Hinkle's trades were inconsistent with Fidelity's. On the other two dates that they spoke, Hinkle traded *after* Fidelity.

The single ambiguous instant message in which Hinkle referred to a "beantown buyer" also fails to support the conclusion that Hinkle knew about Fidelity's (as opposed to Donovan's) intentions. Even if the Court were to accept the SEC's view that that message means that Hinkle knew that that Fidelity was a "buyer" on July 9, 2003, Hinkle did not trade on July 9 or any other day until week later, on July 16. By that time, whatever *daily* order information Hinkle could have known about at the time of the July 9 instant message would have became public, because by then the orders pending on July 9 would have been executed, cancelled, or rendered immaterial by the many trades of Fidelity and others between July 9 and July 16.

Second, the undisputed evidence establishes that Hinkle did not "trade ahead" of Fidelity. The SEC challenges eight trades made by Hinkle. There were only two days

that Hinkle and Fidelity both bought or sold on the same day. But on those occasions, Hinkle actually traded *after* Fidelity's orders were executed (and therefore, according to the SEC's theory, the prices at which Hinkle bought and sold would have been affected by Fidelity's trade just like all other market participants). On each of the other six dates[1] during which alleged improper trades occurred, Hinkle made an investment decision that was, in whole or in large part, *contrary* to Fidelity's.

Finally, throughout the period, Fidelity *bought and sold*, and often, Fidelity did both on the same day. It is impossible to draw any conclusion about what effect such inconsistent and ever-changing information could have on the price of a security (particularly as to an investor like Hinkle, who did not "day trade" on his own account to take advantage of minute intraday price movements). Thus, that information is immaterial as a matter of law.

## UNDISPUTED EVIDENCE

1. In 2003, Donovan was an equities trader at Fidelity, based in Boston. (Compl. ¶ 12). Hinkle was a securities broker based in Dallas, Texas. (Id. ¶ 13). Hinkle did business with Fidelity and often spoke with Donovan about business and personal matters. (Id. ¶¶13, 26). They frequently discussed their personal investment ideas. (Id. ¶ 28).

2. In early July, 2003, a well-regarded Fidelity analyst named Andy Sasssine[2] recommended that Donovan buy Covad stock for his personal account.

---

[1] Hinkle bought or sold on nine occasions during what the SEC calls the "relevant period" of July and August; the SEC's complaint alleges that he traded ahead of Fidelity on eight of the trades. (Compl. ¶¶ 35-45).

[2] Sassine analyzed stocks in a different sector of the market than Covad; he did not recommend that Fidelity funds buy the stock; he owned the stock in his personal account and he often spoke with Donovan and others at Fidelity about their personal investments. (Sassine Dep. at 14-15, 26, 95-97).

3

(Donovan Dep.[3] at 18-19; Sassine Dep. at 26). Donovan then told many brokers with whom he did business, including Hinkle, about Sassine's recommendation and that Donovan intended to buy the stock. (Donovan Dep. at 23; Hinkle Dep. at 117-118; Cawley Dep. at 63-64; Pascucci Dep. at 62-63; Smith Dep. at 40).

    3. The SEC contends that in July and August 2003, Hinkle engaged in eight improper trades: six purchases (on July 8, 16, 21, 31, August 4, and 15) and two sales (August 19 and 26).[4] (Compl. ¶¶ 35-45; *see also* Affidavit of Daniel P. Tighe ('Tighe Aff."), Ex. A).

    4. During this time, Fidelity maintained information about its daily orders to buy and sell securities for one or more of the many Fidelity mutual funds in a system, referred to by Fidelity as the "AS400 system." (Affidavit of Venkatesh Garani ("Garani Aff."), ¶ 4). The information in the AS400 system changed each trading day. (Id. ¶ 7). Unless an order was "good until cancelled," it would be executed on the trading day that it was entered or it would be automatically cancelled at the end of that day. (Id. ¶¶ 5-7). Trades that were "good until cancelled" remained in the system until execution. (Id. at ¶ 7). Trades also could be and were revoked. (Id. ¶ 6). Other than orders that were "good until cancelled," there was no information in the AS400 that reflected a portfolio manager's plan to acquire or sell a stock. (Id., Ex. B (AS 400 printout)). When a trade was completed, the price and time of the trade are recorded in the AS400. (Id. ¶ 6 & Ex. B).

    5. Only Fidelity employees had access to the AS400 system. (Id. ¶ 5).

---

[3]     Deposition Testimony will be referred to as "[Deponents Last Name] Dep. at __." Excerpts of transcripts are attached to the Affidavit of Daniel P. Tighe ("Tighe Aff.") as Exhibits D-K.

[4]     Hinkle also bought or sold Covad stock on nineteen occasions after August 2003.

4

6. Between July 8 (the date of Hinkle's first Covad trade) and August 28 of 2003 (the end of the "relevant period"), Fidelity traded Covad stock on 34 of 39 possible trading days. (Id., Ex. A). On nine of those 34 dates (26%), Fidelity only bought Covad stock. On eleven of those days (32%), Fidelity only sold. On fourteen other days (41%), Fidelity both bought *and* sold. (Id.)

7. There were seventeen different Fidelity funds that owned (and bought and/or sold) the stock during the period. (Id.) Those funds were (and are) managed by different portfolio managers. (Id.)

8. On July 8, 2003, Hinkle made his first purchase of Covad stock. His transactions were executed at 3:21 and 3:33 PM. (Tighe Aff. Ex. A; Compl. ¶ 35). By the time that Hinkle bought, Fidelity's trades for that day had been executed. (Garani Aff. Ex. B. at SEC-FID-Covad 00244).

9. After July 8, Hinkle bought Covad stock on five occasions (July 16, 21, 31, and August 4 and 15). On each of those dates, Fidelity sold. (*See* Tighe Aff. Ex. A; Garani Aff., Ex. A).

10. On August 26, Hinkle sold. His trades were executed between 10:07 and 11:31 AM. (Tighe Aff. Ex. A). That same day, Fidelity also sold. Its trades were executed at 9:33 A.M. (Garani Aff, Ex. B SEC FID –Covad 00316).

11. Hinkle sold on one other occasion (August 19). (Tighe Aff., Ex. A). Fidelity bought (and sold) on that day. (Garani Aff., Ex. A).

12. On four of the eight days when the challenged transactions took place, Hinkle and Donovan spoke on the telephone. (Affidavit of Matthew R. Giese ("Giese

Aff."), Ex. A, pp. 6, 36, 50, 51).[5] On two of those days (July 31 and August 19), Hinkle traded contrary to Fidelity. On the other two days (July 8 and August 26), Hinkle traded after Fidelity.[6] Hinkle testified that Donovan did not tell him about Fidelity's trading activity in Covad. (Investigative testimony of Hinkle, at 72-73, 159-61).

13. The following table summarizes the relationship between Hinkle's trades, Fidelity's trades (where relevant, the time of the trade), and whether Donovan and Hinkle spoke on the telephone on that date.

| Date | Hinkle | Fidelity | Evidence of call with Donovan? |
|---|---|---|---|
| July 8 | Buys 15,000 (at 3:21-3:32 PM) | Buys 127,700 (50,000 at 9:14; 75,000 at 2:14)[7] | Yes |
| July 16 | Buys 5,000 | Sells 75,000 Buys 150,000 | No |
| July 21 | Buys 10,000 | Sells 100,000 Buys 100,000 | No |
| July 31 | Buys 20,000 | Sells 3531 | Yes |
| August 4 | Buys 10,000 | Sells 287,500 Buys 322,500 | No |
| August 15 | Buys 15,000 | Sells 10,000 | No |
| August 19 | Sells 25,000 | Buys 658,600 Sells 217,700 | Yes |
| August 26 | Sells 50,000 (at 10:07-10:17 and 11:31) | Sells 440,300 (at 9:33) | Yes |

---

[5] The page references to the Giese Affidavit show calls to and from Donovan's extension to and from the 214 area code, which was the prefix for Hinkle's telephone numbers. *See* April 14, 2005 investigative testimony of David Hinkle at 61-64.

[6] Hinkle and Donovan also spent a weekend in Nantucket together with their wives and others in early August, 2003, while the market was closed. (Donovan Dep. at 97-98).

[7] *See* Garani Aff. Ex. B. at SEC-FID-Covad 00244.

14. The 10 most active days for Fidelity during this period (netting sales against purchases) were July 30 (buys 424,500 shares), August 1 (buys 325,000 shares), August 5 (buys 550,000 shares), August 6 (buys 600,000 shares), August 7 (buys 158,700 shares), August 14 (sells 250,000 shares), August 22 (sells 600,000 shares), August 25 (sells 600,000 shares), August 26 (sells 440,300) and August 28 (sells 210,000 shares). (Garani Aff. Ex. A).

15. Hinkle traded on only two of those 10 days (August 26 and August 28). On the 26th, he sold after Fidelity's sales had been executed. On the 28th, he bought while Fidelity was (on a net basis) selling. (Tighe Aff. Ex. A).

16. Hinkle's largest purchases (of those challenged by the SEC) were on July 15 ($30,679) and July 31 ($24,500). (Tighe Aff., Ex. A). On both of those days Fidelity sold (and did not also buy). (Garani Aff., Ex. A).

17. On August 19, Fidelity made its largest investment on a net basis (approximately $1,318,596), but Hinkle sold. (Id).

18. Hinkle's college roommate, close friend and fellow broker (at another firm), Brian Higgins, also invested in Covad during this period. (Higgins Dep. at 12, 18-19).

19. In July and August, 2003, Hinkle and Higgins exchanged at least 220 instant messages related to Covad. (Tighe Aff., Ex. B). In one of them, sent on July 9, 2003, Hinkle suggested that that Higgins also should buy Covad and noted: "covd – beantown large buyer." (Compl. ¶ 36). Hinkle testified that "beantown large buyer" referred to Donovan and Sassine (although Donovan did not tell Hinkle Sassine's name). (Hinkle Dep. at 110-14).

20. The SEC alleges that based on information that Donovan viewed on the AS400, Donovan purchased Covad stock through an account held in his mother's name on August 5, 6, and 7. (Compl. ¶ 46). Hinkle did not buy on any of the dates that Donovan allegedly bought. (Tighe Aff. Ex. A).

21. The SEC alleges that the shares in Donovan's mother's account were sold on September 5. (Compl. ¶ 58). Although Hinkle owned 441,100 shares of Covad stock at that time, he did not sell them until October. (Tighe Aff., Ex. A).

## SUMMARY OF CLAIMS

The SEC's Complaint alleges that during the "relevant period," which is defined as "July through September 2003" (Compl. ¶ 1),[8] Hinkle "defrauded Fidelity and its advisory clients, including the Fidelity Funds,[9] by gaining access to confidential trading information stored on Fidelity's internal order database, by learning that Fidelity's advisory clients, including the Fidelity Funds, were purchasing and intended to continue purchasing for its advisory clients a substantial amount of [Covad stock]," and by "trading . . . ahead" of the orders. (Compl. ¶¶ 1, 8). The SEC alleges that information about Fidelity's orders was "material" because the execution of such an order "had a strong potential to affect the stock's price." (Compl. ¶ 64).

The SEC alleges a single claim for violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].[10]

---

[8] The Complaint otherwise ignores all evidence of Hinkle's (significant) trading in Covad securities after August, 2003. See note 1 above.

[9] Neither Fidelity nor its advisory clients (the various mutual funds) ever made such a claim.

[10] Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange . . .

# ARGUMENT

To prevail in an action for securities fraud under Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, "the SEC must show that 1) defendants engaged in fraudulent conduct, 2) in connection with the purchase or sale of securities, 3) through the means or instruments of transportation or communication in interstate commerce or the mails and 4) with the requisite scienter." SEC v. Tambone, 417 F.Supp.2d 127, 131-32 (D. Mass. 2006).

Although the SEC may rely on circumstantial evidence to prove an insider trading case, *see* SEC v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000), it cannot avoid summary judgment by pointing only to evidence "that would require a jury to speculate" that a defendant possessed material non-public information or that he traded on it. *See* SEC v. Truong, 98 F. Supp 2d. 1086, 1095, 1098-99 (N.D. Cal. 2000) (partial summary judgment for defendant where jury would be required to speculate whether a defendant's "access to" inside information matured into possession and where trading was spread across weeklong period after communication); SEC v. Goldinger, 106 F.3d 409, 1997

---

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

WL 21221, *1-*3 (9th Cir. 1997) (circumstantial evidence insufficient to infer tipping where one party merely inquired to another in hallway about upcoming transaction) (unpublished); SEC v. Gonzalez de Castilla, 184 F.Supp.2d 365, 376-77 (S.D.N.Y. 2002) (SEC must present evidence of transfer of inside information and cannot rest merely on proof of "the circumstances, the timing, and the nature of the relationships").

In light of these legal requirements, there are three reasons for why this claim fails. First, there is no evidence that Hinkle knew of the Fidelity orders. Second, there is no evidence of Hinkle trading ahead of Fidelity, and thus, no evidence of "fraudulent conduct." Third, because Fidelity was a buyer and a seller throughout this period (and often, it was both on the same day), sporadic access to Fidelity's order information would not have provided a material advantage because the information was contradictory and fast changing; any advantage in predicting changes in the price of Covad stock would have dissipated rapidly.

### A. There is No Evidence of Scienter.

In order to prove a "manipulative or deceptive device" as required by Section 10(b)5, or the "device, scheme or artifice to defraud" necessary for a Rule 10b-5 claim, the SEC must prove "scienter," which is "a mental state embracing intent to deceive, manipulate or defraud." SEC v. Druffner, 353 F. Supp. 2d 141, 149-50 (D. Mass. 2005), *quoting* Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). In the context of an insider trading case, the government must prove that Hinkle "traded on the basis of information that was confidential at the time he traded on it." SEC v. Nothern, 598 F. Supp. 2d 167, 172 (D. Mass., Feb. 20, 2009) (denying summary judgment because of factual dispute as to whether information became publicly available minutes before trade)

(internal quotation omitted); Truong, 98 F. Supp 2d at 1095 (SEC must "prove that the trader *actually used* the material nonpublic information in formulating and consummating a trade.") (emphasis supplied);[11] see also SEC v. Musella, 578 F. Supp. 425, 439-40 (S.D.N.Y. 1984) (SEC must prove that defendants traded based on knowledge of non-public information).

Evidence of "generalized conversations," "suspicious trades" or "access to" material non-public information does not, as a matter of law, demonstrate the specific knowledge that is necessary to show that Hinkle acted with scienter. *See* SEC v. Goldsworthy, 2007 WL 4730345, *18 & n. 20 (D. Mass. 2007) (entering summary judgment on claims against one of three co-defendants who participated in conversations, where SEC failed to prove that conversations addressed subject of alleged fraud); *citing* Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 255 (D. Mass 2001) (generalized allegations about access to information fail to establish scienter); Gonzalez de Castilla, 184 F. Supp.2d at 376 (summary judgment allowed where SEC relied on "the circumstances, the timing, and the nature of the relationships"); Truong, 98 F.Supp.2d at 1097-98 ("suspicious trading" and "access to" information insufficient).

To prove scienter in this case, the SEC relies on three types of evidence: Hinkle's trading history, telephone calls with Donovan and the "beantown buyer" instant message. Upon examination, this evidence does not prove scienter, even circumstantially.

---

[11] In Truong, an employee and shareholder of a publicly traded company sold shares of the company in the weeks prior to the company's announcement that it had failed to meet revenue expectations. The SEC offered evidence that, prior to the trades, (i) several individuals in the company were provided financial documents revealing decreased revenue figures, although there was no evidence that the defendant saw these confidential reports; and (ii) the company's personnel and outside counsel were working on the annual report which discussed the financial condition of the company during an evening that the defendant was working late. The SEC also introduced evidence that the defendant was exposed to more general information about the financial state of the company, which the Court found immaterial. Truong, 98 F.Supp.2d at 1098-1100.

First, with respect to Hinkle's trading history, as is detailed above, it is hardly "suspicious." If the trading suggested anything, it is that Hinkle did *not* know what investment decisions Fidelity intended to make. Put simply, if, as the SEC contends, Hinkle knew what Fidelity was about to do and if he believed that Fidelity's trades would move the market, then the SEC must demonstrate from the trading history that Hinkle: (a) traded before Fidelity; (b) made the same investment decision as Fidelity; (c) traded on the days that Fidelity was most active; and (d) bought and sold much more frequently to capture whatever benefit could be derived from Fidelity's many different investment decisions (which fluctuated daily). Yet none of these patterns emerge from the data.

Second, for Donovan's phone calls with Hinkle to be probative, there must be *something* about them to suggest that they were not ordinary business calls; but there is not. Given that Fidelity's intentions to buy or sell Covad stock changed daily, one would expect to see at least one phone call with Donovan on each of the days that Hinkle traded. Otherwise, Donovan's alleged tips would become stale. But Hinkle did not telephone Donovan on each of those days. They spoke on only four of the eight days at issue. Moreover, on the days when they did speak, if the SEC's theory were correct, Hinkle's trades would have to line up with Fidelity's. But on two of the four days that they spoke (July 31 and August 19), Hinkle did the opposite of what Fidelity did. Thus, even if Donovan provided information from the AS400 on those days, Hinkle did not trade on it. On the two other dates that they spoke (July 8 and August 26), Hinkle bought *after* Fidelity had completed its buying and selling for the day; so again, Hinkle did not trade on whatever Fidelity information Donovan is alleged to have conveyed.

12

Finally, there is July 9 the "beantown buyer" email. The SEC would invite a jury to speculate that the real meaning of that message was that Hinkle was telling Higgins that Fidelity was going to be a buyer for the next two months. At first blush, this might appear to be a jury issue, but when reviewed in context, that message cannot bear the weight that the SEC would place upon it.

According to the SEC, Hinkle first learned about Fidelity's AS400 information from Donovan on July 8 (Compl. ¶ 35, 36). But the "beantown buyer" message was not sent when Hinkle is alleged to have had knowledge about Fidelity's July 8 intentions. It was sent the next day – July 9 – well *after* the order information that Hinkle is supposed to have known about the preceding day. Thus, even under the SEC's view of the world, the most that the July 9 message could have meant was that Fidelity *had been* a "buyer" on July 8 (before Hinkle bought) or, perhaps, it could mean that Fidelity *would be* a buyer on July 9. Either way, it does not demonstrate that Hinkle traded improperly because Hinkle did not trade ahead of Fidelity on July 8 (he bought after Fidelity) and he did not trade at all on July 9 (or any other day until July 16). By the time of Hinkle's next trade after the July 9 message (which was on July 16th), whatever Hinkle could have known about Fidelity's orders on July 9 was stale.

Even if Hinkle had full access to the AS400 on July 9 (and there is no evidence that he did), he could not possibly have known then that Fidelity was going to be a monolithic "buyer" throughout the relevant period. If on July 9, Hinkle could have peeked both at the AS400 and into the future, he would have seen that one or more of seventeen different Fidelity funds, managed by various different portfolio managers would buy and/or sell Covad stock on very nearly every date during the relevant period.

13

(*See* Garani Aff. Ex. A). So even if Hinkle knew that Fidelity was a buyer on July 9, he could not have meant to say that Fidelity would be a buyer after July 9, *because that was not true and there was no way for him to have known that*.

Finally, the instant message must be viewed in context. There is no dispute that shortly before July 9, Boston-based Donovan told Hinkle (and many others) that he was going to buy Covad stock at the recommendation of a knowledgeable Boston-based Fidelity analyst. (Donovan Dep. at 23; Hinkle Dep. at 117-18). There is really no reason to suppose that Hinkle's "beantown buyer" message meant anything more than that. Indeed, throughout the rest of July and August of 2003, Hinkle and Higgins shared 220 instant messages in which, the evidence suggests, they told each other everything that they heard, knew or thought about Covad, including their predictions about the stock price and rumors. *See e.g.* Tighe Aff. Ex B, p.1-4 ("just talked to a guy – going to 3 [dollars per share]"); ("just got an order to buy 40K covd" from "pretty well connected" person who "must be hearing something"); ("bruce telling me this covd info . . . hearing going to 3 as well); ([bruce] hearing nothing but good things. . ."); ("at least covd beat estimates"); ("august historically bad month"); ("covd about to go again") ("u think that news about neg[ative] cash flow being high risk the reason [for decline in price]?"). If, as the SEC alleges, Hinkle's access to daily Fidelity orders was the reason that Hinkle bought and sold Covad stock, in the hundreds of instant messages on every conceivable bit of news related to Covad, one would expect to see some update of the "beantown buyer's" daily intentions. Yet, again, there is none.

B. There is No Evidence that Hinkle Traded Ahead of Fidelity.

The alleged scheme at the heart of the SEC's complaint is known as "front running," in which "a trader [here, Donovan] discloses his orders so a confederate [Hinkle] may profit by 'trading ahead' – selling when the disclosed orders will then depress the market or buying when those orders will raise prices." Board of Trade v. Commodity Futures Trading Comm'n, 724 F. Supp. 548, 556 (N.D. Ill. 1989). The evidence does not support the theory.

There are only two dates during the relevant period when Hinkle's trades are consistent with Fidelity's: when the alleged scheme began (July 8) and ended (August 26). On each of those dates, Hinkle traded *behind* Fidelity. That is, he bought (on July 8) and he sold (on August 26) after Fidelity executed all of its trades for that day. As a matter of law, even if Hinkle had material information on those dates (which he denies), it was public at the time that Hinkle traded and it did not give Hinkle any trading advantage. Once Fidelity's trades were executed, the market learned (assuming it did not already know) about Fidelity's trades. If that was material information, the presumptively efficient market would have immediately adjusted the price of the Covad stock accordingly. That adjusted price is what Hinkle paid. Information becomes public when disclosed "to achieve a broad dissemination to the investing public generally and without favoring any special person or group," SEC v. Mayhew, 121 F.3d 44, 50 (2d Cir. 1997), *quoting* Dirks v. SEC, 463 U.S. 646, 653 n. 12, 103 (1983) (citing In re Faberge, Inc., 45 SEC 249, 256 (1973)), or moreover, when known only by a few persons but "fully impounded into the price of the particular stock," United States v. Libera, 989 F.2d

596, 601 (2d Cir. 1993). *See also* Board of Trade, 724 F. Supp at 556, n. 15 (order information known by traders before execution is public).

In fact, the prices paid by Hinkle and Fidelity demonstrate that Hinkle did not realize any benefit from trading behind Fidelity. On July 8, Covad traded between a low of 85¢ and a high (at the close of the market) at $1 (Tighe Aff. Ex. C). Fidelity bought at 87¢ and 89¢. (Garani Aff., Ex. A). Hinkle bought at prices that ranged from 92¢ to 96¢. (Tighe Aff. Ex. A).[12] While it is far from clear that Fidelity's trades caused the stock price to rise, if that is true, Hinkle experienced (and, in a sense, was harmed by) the price increase like all other market participants.[13]

In addition to the two trades discussed above (July 8 and August 26), the SEC alleges that Hinkle traded improperly on six other dates. But, on each of those dates,

---

[12] On August 26, Covad traded in a range from $3.05 to $3.95, closing at $3.27. (Tighe Aff. Ex. C). Fidelity sold that day at $3.36. (Garani Aff. Ex. A). The prices actually increased for a time after that sale (undercutting the SEC's theory about the materiality of Fidelity's trades) and Hinkle sold at prices that ranged between $3.31 and $3.54. (Tighe Aff. Ex. A).

[13] The SEC may argue that even though Hinkle traded after Fidelity's trades were executed, he was still trading on inside information because, he also knew about other unexecuted limit orders. This argument would defy common sense and is at odds with NASD rules. The only unexecuted orders that may have been outstanding (it is not clear when the orders were entered) when Hinkle traded on July 8 were limit orders to buy at 85¢, 89¢ and 87¢. (Garani Aff. Ex. A, at SEC-FID-Covad pp. 00243, 00460). If that information were known to the public, it might have driven the price down, not up. But more importantly, by the time Hinkle bought (at 92¢ to 96¢), the stock was trading much higher than the limit price set by Fidelity. Under NASD rules, even if Fidelity had asked Hinkle to execute those limit orders – and that did not happen – Hinkle's trade would be permitted. The NASD interprets the "best execution rule" (Rule 2110) so that "members that handle customer limit orders, whether received from their own customers or from another member, are prohibited from trading *at prices equal or superior to that of the limit order without executing the limit order.*" NASD Manual, Conduct Rule IM 2110-2(a). Since the prices paid by Hinkle exceeded the limit order price (the transactions were made on far less favorable terms than the trades sought by Fidelity), even if Hinkle knew about the Fidelity orders and was himself engaged to execute them, his trades were proper.

16

Fidelity's trades were inconsistent with Hinkle's trades in whole (July 21,[14] July 31 and August 15) or in large part (on July 16 and August 14, 19).[15]

It bears repeating that the central premise of the SEC's case is that when Hinkle knew that Fidelity was about to buy, he bought; and when Hinkle knew that Fidelity was about to sell, he sold. But the actual trading history contradicts that theory almost entirely. Indeed, given Fidelity's constant buying and selling during this period – buying on nine dates, selling on eleven dates and doing both on fourteen days – if the SEC chose at random almost any eight trades of Covad in the open market during July and August on 2003, it is likely that those trades would align with Fidelity's orders better than Hinkle's trades did.

Finally, quite apart from the time of execution and the opposite direction of the trades, the frequency and timing of Hinkle's trades also refute any inference that Hinkle was trading on Fidelity order information. Under the SEC's theory of this case, Fidelity's effect on the price of Covad stock would have been most pronounced on the days when Fidelity was most active. It follows then, that if Hinkle was "trading ahead," he would have traded on those dates to maximize his profit. But, again, the data does not support the SEC's theory. On the ten days that Fidelity was most active, Hinkle traded only twice, and then, he traded after Fidelity (on August 26) or he bought when Fidelity was (on a net basis) selling (on August 28).

---

[14] On July 21, Fidelity bought and sold the exact same number of shares at the same price, within four minutes, effectively. (*See* Garani Aff. Ex. A, at SEC-FID-COVAD 00253).

[15] In addition, on August 28 – the date of the trade that is not alleged to have been improper – Hinkle bought while Fidelity was, on a net basis, selling (sold 379,000 shares and bought 167,000). (Tighe Aff. Ex. A).

Similarly, since the AS400 showed only Fidelity's then-current *daily trading* intentions, Hinkle would have to buy and sell daily – or more than daily – to capitalize on the dynamic information that he was supposed to have learned from Donovan. But he did not. For example, after he first bought Covad stock (on July 8), Fidelity sold on seventeen dates before Hinkle's first sale (on August 19). And, when Hinkle finally did sell for the first time, Fidelity was, on a net basis, buying the stock.

In short, no matter how one looks at it, there is just no evidence of "trading ahead."

### C. Fidelity's Mixed Orders Are Not Material.[16]

Finally, summary judgment should enter because during this time period, the Fidelity order information was so inconsistent and changed so frequently that no reasonable investor could come to any conclusion about the effect that it would have on the market.

Information is material if there is a "substantial likelihood that a reasonable investor would consider it important in making an investment decision." SEC v. Durgarian, 477 F.Supp.2d 342, 349 (D. Mass. 2007), *citing* SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F.Supp.2d 454, 464 (S.D.N.Y.2004), and Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). "The issue of materiality may be regarded as a mixed issue of law and fact." Truong, 98 F. Supp 2d at 1095, citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976). It may be and frequently is decided on summary

---

[16] In the Complaint, the SEC alleges at times that the Fidelity order information was "confidential," (see e.g. Compl. ¶ 30). However, alleging that information is "confidential" does not excuse the SEC from proving that the information also was material. *See* U.S. v. O'Hagan, 521 U.S. 642, 653 (1997) (misappropriation theory "designed to protec[t] the integrity of the securities markets against abuses by outsiders to a corporation who have access to confidential information *that will affect th[e] corporation's security price when revealed*") (emphasis supplied, internal quotations omitted, alterations in original).

judgment as a matter of law. *See* SEC v. Hoover, 903 F.Supp. 1135, 1147 (S.D. Tex. 1995) (summary judgment allowed where incremental change in expectations known to insiders would not have been significant to investors and was immaterial as a matter of law even when the information foreshadowed larger subsequent change in expectations); In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997) (information is immaterial as a matter of law where it would have "no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings"); SEC v. Mangan, 598 F.Supp.2d 731, 734-35 (W.D.N.C. 2008) (granting summary judgment where SEC is unable to demonstrate that information that defendant traded on had an impact upon the price of the security; noting that there is "no shortage of cases that make clear that materiality may be resolved by a court as a matter of law"), *citing* Greenhouse v. MCG Capital Corp., 392 F.3d 650, 657 (4th Cir. 2004).

In this case, Fidelity bought or sold Covad stock on 34 (of 39) trading days between July 9 and August 28. (Garani Aff, Ex. A). On 23 of those days, it bought. On 25 of those days, it sold. On fourteen days, it did both. Any reasonable investor confronted with such conflicting information would have thrown up her hands rather than try to guess about Fidelity's ever-changing trading decisions and whatever effect such trades would have on the market. Under such circumstances, the information is immaterial as a matter of law.

## CONCLUSION

For all of the reasons set forth above, Hinkle requests that the Court allow this motion, enter judgment in his favor, and dismiss with prejudice all claims in the Complaint against him.

DAVID R. HINKLE.

By his attorneys,

/s/ Daniel P. Tighe
Daniel P. Tighe (BBO 556583)
Douglas R. Tillberg (BBO 661573)
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, Massachusetts 02110-2214
Tel: (617) 542-9900
Fax: (617) 542-0900

Dated: July 28, 2009

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 28, 2009.

/s/ Daniel P. Tighe