UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAVID K. DONOVAN, JR.<br>and DAVID R. HINKLE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No.: 1:08-CV-10649-RWZ<br>)<br>)<br>)<br>)<br>)<br>) |

**DAVID HINKLE'S REPLY BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

David R. Hinkle's summary judgment papers demonstrated with empirical data that, in fact, Hinkle did not "trade ahead" of Fidelity, as the SEC alleged. In a trading ahead scheme, the accused buys or sells *before* the market learns of information that might affect the price of a security. As the SEC seems to concede by its silence, Hinkle did not do that. Hinkle's trades either came after Fidelity's or they were in whole or in large part contrary to Fidelity's.[1]

So the SEC's Opposition to Defendant David Hinkle's Motion for Summary Judgment ("Opp.") (Dkt. No. 28.) tries to avoid summary judgment by proposing a vague theory (which it casts as the second "half" of its case). (Opp. at 1.) The SEC claims that Hinkle's trades were improper because he allegedly knew of largely unspecified

---

[1] Under the SEC's theory, a Fidelity purchase of Covad stock would drive the price up and a Fidelity sale would drive the price down. As Hinkle's moving papers demonstrated, if the SEC is correct: on two of eight dates at issue, Hinkle traded in Fidelity's wake, thus *suffering* from whatever effect Fidelity's trades had on the stock price; on the other six occasions at issue, Hinkle either purchased Covad as Fidelity was selling or he sold as Fidelity was buying.

"information" within Fidelity's order database that related to orders *that were not executed*.

But the SEC never explains how or why Fidelity's unexecuted orders (and related information such as the identity of an interested fund, the quantity of shares at issue and, in the case of limit orders, the price at which Fidelity wished to buy or sell) could be material. Those orders were revocable, inconsistent (that is, the system had buy orders as often as it had sell orders) and most critically, they never became known to the market. As a matter of law, even if Hinkle knew of such information (and the SEC's argument on that point depends on a number of speculative leaps) it cannot form the basis of a securities fraud claim. The only Fidelity orders that could even arguably affect Covad stock price are the ones that were executed, and Hinkle did not trade on them.

Beyond that, when stripped of rhetoric and speculation, the rest of the SEC's Opposition posits that even if Hinkle's actual trades bear no relationship to Fidelity's, a jury still should be invited to speculate that Hinkle violated the federal securities laws because: (a) Donovan had *the opportunity* to tell Hinkle about Fidelity's orders to buy and/or sell Covad stock; (b) *Donovan* engaged in a *separate* alleged scheme; and (c) the SEC over-reads three ambiguous words in one of the 220 instant messages that Hinkle sent to a friend about Covad. There is just not enough evidence for the SEC to survive summary judgment.

**A.  UNEXECUTED ORDERS – THAT NEVER REACHED THE MARKET – ARE NOT MATERIAL.**

As a threshold matter, it is important to note that contrary to the SEC's argument, materiality does *not* turn on whether an investor "would want to know" the information at issue. (*See* Opp. at 15.) In this circuit and elsewhere, "the mere fact that an investor

might find information interesting or desirable is not sufficient to satisfy the materiality requirement" of a 10b-5 claim. Milton v. Van Dorn Co., 961 F.2d 965, 969-970 (1st Cir. 1992). "Rather, information is 'material' only if its disclosure would alter the '*total mix*' of facts available to the investor and 'if there is a *substantial likelihood* that a reasonable shareholder would consider it important' to the investment decision." Id. (emphasis in original), *quoting* Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988), *and* TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Information which "involves *speculative* judgments about future events," is only material if accompanied by information that permits "a balancing of both the *indicated probability* that the event will occur and the *anticipated magnitude of the event* in light of the totality of the company activity." Milton, 961 F.2d at 969-970 (affirming summary judgment on materiality grounds where summary judgment record was devoid of facts from which jury could conclude that information omitted was material) (emphasis in original), *quoting* Basic, 485 U.S. at 238.[2]

One objective way to assess materiality is to measure the effect, if any, that the information had on the price of the stock. *See* S.E.C. v. Mangan, 598 F. Supp. 2d 731, 736 (W.D.N.C. 2008) (measuring market effect of information and concluding from effect on stock price that information was immaterial as a matter of law), *citing* Oran v. Stafford, 226 F.3d 275, 283 (3d Cir. 2000) (dismissing plaintiffs' claims where public disclosure of information by the company "had no appreciable negative effect on the company's stock price"), *and* In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997) (where release of sales information had no appreciable effect on

---

[2] The standards for materiality developed in private 10b-5 litigation apply equally to enforcement proceedings brought by the SEC under those same statutes and rules. *See e.g.*, S.E.C. v. Mangan, 598 F. Supp. 2d 731, 736 (W.D.N.C. 2008).

stock price, information immaterial as matter of law), *and* In re Allied Capital Corp. Sec. Litig., 2003 WL 1964184, *6 (S.D.N.Y. 2003) (ten percent decline in value of stock immaterial when viewing stock's price movements as whole), *and* In re Lucent Techs. Inc. Sec. Litig., 217 F. Supp. 2d 529, 543 (D. N.J. 2002) ("when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock").

There are three critical features of the Fidelity order information (that the SEC never discusses) which make it immaterial.

First, and most significantly, the order information at issue in this case must fall into one of two categories: orders that were filled and orders that were not filled. For those that turned into executed trades, Hinkle did not trade on them. *See generally* Hinkle's Memorandum in Support of Motion for Summary Judgment (Hinkle Summary Judgment Brief") (Dkt. No. 23.) The rest, by definition, were cancelled or expired before the market could know about them.

Second, although it is impossible to discern just what information appeared in Fidelity's AS400 system at any time other than the start and end of the day,[3] one thing is clear: Fidelity bought *and/or* sold on almost every day during the relevant period. Specifically, between July 8, 2003 (the date of Hinkle's first Covad trade) and August 28, 2003 (the end of the "relevant period"), Fidelity traded Covad stock on 34 of 39 possible trading days. (Garani Declaration, Ex. A) (Dkt. No. 26.) On nine of those 34 dates

---

[3] *See* Garani Decl. ¶ 12 (Dkt. No. 26) ("One limitation in the AS400 is that Fidelity cannot recreate what appeared in the AS400 system at any particular time of day. The system preserves information only as of the end of a given day. An AS400 record entry does not always enable a user to tell when the initial order was entered. . . .").

(26%), Fidelity bought Covad stock.  On eleven of those days (32%), Fidelity sold.  On fourteen other days (41%), Fidelity both bought *and* sold.  (Id.)  This contradictory market behavior undermines the SEC's (unspoken) premise that the order information indicated that as a general matter, Fidelity was going to be a buyer (and drive up the price of the stock), or a seller (and drive down the price of the stock).  In fact, to the extent that the orders indicated anything, it was that Fidelity was *both* a buyer and a seller, and to the extent that the orders were executed, if they affected the stock price at all, they moved it *up and down*.

Third, the order information in Fidelity's AS400 system was changing constantly. (Garani Decl. ¶ 6-7.) (Dkt. No. 26.)  Unless an order was "good until cancelled," it was executed on the trading day that it was entered or it was automatically cancelled at the end of that day.  (Id. ¶¶ 5-7.)  Only orders that were "good until cancelled" remained in the system until execution.  (Id. at ¶ 7.)  Orders could be and were frequently revoked. (Id. ¶ 6.)  Other than orders that were "good until cancelled," there was no information in the AS400 that reflected a portfolio manager's plan to acquire or sell a stock.  (Id., Ex. B (AS400 printout).)

In contrast to Fidelity's executed trades (which demonstrated Fidelity's *actual* investment decisions) unexecuted "order information" was ethereal.  No reasonable investor who saw it on a Monday morning could draw any conclusions about what Fidelity would do even on Monday afternoon and certainly, those orders said nothing about Tuesday and thereafter.

In a curious argument, the SEC contends that the Fidelity order information is material, even if not executed, because Fidelity is like E.F. Hutton or Warren Buffet's

Berkshire Hathaway and "when E.F. Hutton talks, people listen." (*See* Opp. at 17 & n.8.) But Fidelity did not make consistent investment decisions like Warren Buffet, and the AS400 did not give investment advice like E.F. Hutton. Fidelity is a huge mutual fund complex with many funds and portfolio managers who had obviously different views about the value of Covad stock at the same time. Moreover, unexecuted trades were not messages; they were unspoken, fleeting thoughts about contingent events. So, to borrow the SEC's analogy, reasonable investors would not "listen" to Fidelity's order database at all because it was not giving useful investment advice. The most that one could conclude from the AS400 was that Fidelity might buy, it might sell, it might do both and/or it might change its mind.

Similarly, the SEC makes casual unexplained references to the "information" that was available from the AS400 such as the identity of the fund that had entered an order and, in the case of limit orders, the price that would trigger the purchase or sale. (*See e.g*. Opp. at 1-2; 16.) But again the SEC never explains how this made any difference. If the point is that a buy order from fund A is more meaningful than a sell order from fund B, the SEC never explains why.[4]

In fact, even now, with the benefit of hindsight, the SEC does not hazard a guess as to what Hinkle is supposed to have concluded from his alleged access to that data.[5]

---

[4] The SEC's discussion of the steps that Fidelity takes to maintain the confidentiality of its order information (*see* Opp. at 1-3) merely demonstrates an uncontested issue. Hinkle acknowledges that Fidelity's order data was non-public – at least until it was placed with a broker for execution – but that does not make it material. Indeed, a very good argument can be made that Fidelity keeps its investment decisions private for a host of reasons that have nothing to do with concerns about market integrity: it may not want its competitors to know its trading strategies or perhaps it does not want its customers to know how frequently Fidelity traded the same security.

[5] The SEC contends for example that that Hinkle traded on "information like which Fidelity Funds were ordering Covad stock and the volumes and prices at which they were ordering it," (Opp at 1), "real-time stock selections of these Fidelity Funds" (*id*.) and "open and placed orders" (*id*. at 7). But nowhere in

For six of the eight days that Hinkle is alleged to have traded improperly, the SEC never even bothers to explain what order information in the AS400 Hinkle was supposed to have relied on. Not a word. (*See e.g.* Opp. at 7-11 (discussing Hinkle trades on July 8 and August 4 and ignoring Hinkle's trades on July 16, 21, 31, August 4, 15, 19 and 20).)

The SEC provides *some* information about Fidelity's orders for *two of the eight days* that Hinkle traded, but sheds no light on how the information could be material. For example, to try to demonstrate that Hinkle's trades *on August 4* were improper, for some reason, the SEC discusses Fidelity's trading activity *on August 1*. (Opp. at 9-10.) The SEC claims that Donovan, (and therefore Hinkle), could have seen at mid-day on Friday *August 1*, that several Fidelity funds had "placed[6] orders" for 390,300 shares and another 100,100 open buy orders. One would think that the SEC would then point to specific trades by Hinkle that tried to capitalize on the Fidelity's August 1 orders. Not so. *Hinkle never traded on August 1*.

Hinkle did trade on August 4. But the SEC does not discuss the order data in the system on that day. By the time of Hinkle's August 4 trades, the "placed orders" that the SEC discusses from August 1 had hit the market (*Second* Garani Decl., Ex. A, pp SEC-FID-COVAD-00271) (Dkt. No. 30, Ex. 3, Doc. 30-6). The SEC provides no facts from which one could infer that *any* open orders in place on August 1 were still open when Hinkle traded on August 4. In fact, when Hinkle traded on August 4, like many other

---

the 27 pages of its brief (or the 29 page Rule 56.1 Statement of Alleged Facts) does the SEC say how or even whether Hinkle could have predicted what Fidelity was going to do.

[6]   The SEC's reference to "placed orders" means orders with a time stamp on the corresponding AS400 record. That time stamp means that the trade was executed, not just placed with a broker. (*Second* Garani Decl., ¶ 3 ("when the trade is executed, the broker provides data to the trader, who updates the AS400 to reflect the proceeds paid for the security, the commission paid and *the time the trader noted the execution*. . .").) But even if the time stamp indicates only that the order was placed with a broker, it means that a broker would have informed other brokers of the order in an attempt to fill it, thereby making the information known to the market.

days, some Fidelity funds were buying Covad stock (322,500 shares) and *other funds were selling* (287,500 shares). (S*ee* Hinkle Brief at 6, summarizing trades and *citing* (*First*) Garani Decl. Ex. A.)  So the SEC's discussion of Fidelity's August 1 orders and Hinkle's August 4 trade suggests, at most, that Hinkle had inside information but did not use it.

With respect to July 8, the SEC contends that "the [Fidelity] database would have shown opened and placed orders to buy 200,000 Covad shares for the Fidelity Select Multimedia Fund." (Opp. at 7.)  But the "placed" orders (for 127,700 shares) were actually public by the time that Hinkle traded late in the day (at 3:21 P.M that afternoon). (*See* Second Garani Declaration, Ex A, (Dkt. No. 30, Ex. 3, Doc. 30-6) pp. SEC-FID-COVAD 00243-244 (showing times (9:14 and 2:14) and ¶ 3 ("When the trade is executed, the broker provides data to the trader, who updates the AS400 to reflect the proceeds paid for the security, the commission paid and *the time the trader noted the execution. . . .*").)  That is, Fidelity's July 8 interest in Covad would have been priced into the market by the time that Hinkle traded on that day.  The SEC offers no evidence from which a jury could conclude that any of the unexecuted July 8 orders were *ever* filled or otherwise affected the market.

In summary: (a) orders that ripened into executed trades cannot support the SEC's case because Hinkle did not trade ahead of those trades; and (b) information about orders that did not become trades cannot support the claim because the SEC has not identified how any order information would have altered the mix of information that investors would consider important.

**B.   THE SEC IDENTIFIES NO EVIDENCE OF SCIENTER.**

Because Hinkle had no access to Fidelity's AS400 database, the SEC must rely on circumstantial evidence to prove scienter.[7] But the usual source of circumstantial evidence – suspicious trading – leads the SEC nowhere. That leaves the SEC to argue about (a) all the evidence it supposedly has *against Donovan*; (b) Donovan's opportunity to tell Hinkle about the AS400; and (c) Hinkle's "beantown buyer" electronic message. (*See* Opp. at 19-27.)

First, all the discussion about Donovan's alleged trading in his mother's account on August 4 (Opp. at 22-23) is plainly irrelevant to Hinkle. The SEC contends that Donovan used his mother's account so that *he* could profit from trades that Fidelity would not let him make in his own account. There is no evidence that Donovan received any money from the trades in Hinkle's account.

Indeed, the chronology for August 4 – the day that Donovan allegedly first placed (and revoked) orders in his mother's account – demonstrates just how casually the SEC's memorandum regards unhelpful facts. The SEC contends that Hinkle's trades on August 4 are implicated by the fact that Donovan, who was out of the office that day, called in and asked a Fidelity colleague to check the status of Fidelity's Covad orders at 10:54 A.M. (Opp at 10-11.) The SEC invites the Court to conclude that Donovan must have

---

[7]   In order to prove a claim of insider trading, the SEC must prove scienter, which is "a mental state embracing intent to deceive, manipulate or defraud." SEC v. Druffner, 353 F. Supp. 2d 141, 149-50 (D. Mass. 2005), *quoting* Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). In the context of an insider trading case, the government must prove that Hinkle "traded on the basis of information that was confidential at the time he traded on it." SEC v. Nothern, 598 F. Supp. 2d 167, 172 (D. Mass., Feb. 20, 2009) (denying summary judgment because of factual dispute as to whether information became publicly available minutes before trade) (internal quotation omitted); SEC v. Truong, 98 F. Supp 2d 1086, 1095 (N.D. Cal. 2000) (SEC must "prove that the trader *actually used* the material nonpublic information in formulating and consummating a trade.") (emphasis supplied); *see also* SEC v. Musella, 578 F. Supp. 425, 439-40 (S.D.N.Y. 1984) (SEC must prove that defendants traded based on knowledge of non-public information).

then talked to Hinkle to tip off Hinkle's trades.  The problem is that Hinkle's trades on August 4 were *completed* by 10:15 AM (id.), *before* Donovan ever could have learned about Fidelity's orders that day.  Like other inconvenient facts that disprove any connection between Donovan's conduct, Fidelity's orders and Hinkle's trades, the SEC simply ignores this chronology, arguing in essence that Hinkle must have committed securities fraud because he was an acquaintance of Donovan's.

Second, the fact that Donovan and Hinkle did business together and may have spoken on the telephone on more occasions than phone records demonstrate, does not establish Hinkle's scienter, particularly since, as the SEC acknowledges (*see* e.g. Opp. at 5) there were many legitimate reasons for them to be speaking. *See* SEC v. Goldsworthy, 2007 WL 4730345, *18 & n. 20 (D. Mass. 2007) (entering summary judgment on claims against one of three co-defendants who participated in conversations, where SEC failed to prove that conversations addressed subject of alleged fraud), *citing* Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 255 (D. Mass 2001) (generalized allegations about access to information fail to establish scienter); S.E.C. v. Gonzalez de Castilla, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002) (summary judgment allowed where SEC relied on "the circumstances, the timing, and the nature of the relationships"); SEC v. Truong, 98 F. Supp 2d 1086, 1097-98 (N.D. Cal. 2000) ("access to" information insufficient).

Finally, the SEC spends much time arguing that Hinkle's July 9 "beantown buyer" instant message was special "code" for Fidelity.  (Opp at 19-22.)  As Hinkle demonstrated in his moving papers, it is much more likely that "beantown buyer" meant Donovan, just as Hinkle testified.  But even if that were not so, the message could not

have conveyed any information that Hinkle traded on. According to the SEC, Hinkle first learned about Fidelity's AS400 information from Donovan on the day of his first trade, July 8. (Compl. ¶ 35, 36.) On that day, *after* Fidelity traded, Hinkle bought his shares (begging the question: if Hinkle knew on July 8 that Fidelity intended to buy Covad stock, why didn't he trade on it and "tip" off his friend *before* Fidelity made its plans known to the whole market?). But the "beantown buyer" message was not sent when Hinkle is alleged to have had knowledge about Fidelity's July 8 intentions. It was sent the next day – July 9. Thus, even under the SEC's view, the most that the July 9 message could have meant was that Fidelity *had been* a buyer on July 8 before Hinkle bought – in which case, Fidelity's July 8 orders were priced into the stock when Hinkle bought it – or, perhaps, it meant that Fidelity *would be* a buyer on July 9 or after that. But Hinkle did not trade at all on July 9 (or any other day until July 16). By the time of Hinkle's next trade July 16, undoubtedly, whatever information Hinkle was supposed to have been conveying on July 9 was no longer valid.

Besides, even if Hinkle had full access to the AS400 on July 9 (and there is no evidence that he did), due to the nature of the AS400 data, he could not possibly have known then that Fidelity was going to be a "big buyer" throughout the relevant period. In fact, if purchases are netted against sales, Fidelity was neither a "big buyer" nor a "big seller" during the relevant time.

## CONCLUSION

For all the reasons set forth in Hinkle's moving papers, summary judgment should be granted in Hinkle's favor on all claims asserted by the SEC against him.

DAVID R. HINKLE.

By his attorneys,

/s/ Daniel P. Tighe
Daniel P. Tighe (BBO 556583)
Douglas R. Tillberg (BBO 661573)
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, Massachusetts 02110-2214
Tel: (617) 542-9900
Fax: (617) 542-0900

Dated: September 22, 2009

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 22, 2009.

/s/ Daniel P. Tighe