## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | : | |
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | |
| v. | : | **Civil Action No.** |
| | : | **08-10649-RWZ** |
| **DAVID K. DONOVAN, JR., and** | : | |
| **DAVID R. HINKLE,** | : | |
| **Defendants.** | : | |
| | : | |

### SEC'S MOTION TO RECONSIDER THE JUDGMENT

The plaintiff Securities and Exchange Commission ("SEC" or "Commission")

respectfully asks that the Court reconsider its decision not to impose a civil penalty or order an

injunction against David Donovan ("Donovan") in this case. For the reasons set out below, the

SEC submits that the jury's finding that Donovan willfully engaged in insider trading with his

mother merits the imposition of a penalty and an injunction in addition to the order to disgorge

the ill gotten profit, along with prejudgment interest.[1]

The evidence showed that Donovan repeatedly made a knowing and deliberate choice to

steal material, non-public information that he had promised to protect and use only for the

benefit of Fidelity's mutual fund shareholders. Undeterred by his employment agreement or his

annual acknowledgment of the Code of Ethics restrictions on using Fidelity's clients'

confidential information, and despite the fact that he made an annual salary and bonus of

---

[1] The imposition of prejudgment interest serves to round out the disgorgement amount, preventing a
defendant from benefiting from the use of the ill-gotten gains during the period from offense to
judgment. "The personal wrongdoing of a defendant should be considered in determining that an
award of interest is in accord with doctrines of fundamental fairness. In the context of Section 10(b)
and Rule 10b-5 actions, proof of *scienter* is sufficient to justify an award of prejudgment interest."
*SEC v. Musella*, 748 F. Supp. 1028, 1042-43 (S.D.N.Y. 1989) (internal citations omitted). *See also*
*SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998).

approximately a million dollars (made possible by fees paid by Fidelity clients), Donovan

violated the duty he owed and passed on the highly-protected data to his mother.  Then he

bragged about it to his trader friends.  The fraud and deception in this case are evident on the

undisputed record and from the jury's verdict.

As it stands, the Court's judgment currently requires only disgorgement of the profits

gained (without prejudgment interest).  This result sends a message to the public markets and the

public that David Donovan's illegal conduct does not merit punishment.  For violating the

securities laws and stealing information from investors, he is simply to pay back the amount that

was stolen.  The Commission respectfully submits that, in light of the record facts, a judgment

that imposes only a requirement to reimburse Fidelity in the amount of the unjust enrichment

will not sufficiently penalize Donovan's illegal conduct and does not give sufficient weight to

the importance of the duties that he knowingly and deliberately violated.  *See SEC v. Kirsh*, 263

F. Supp. 2d 1144, 1152, 1153 (N.D. Ill. 2003) ("Imposing no civil penalty at all [is] a result that

would impermissibly increase the incentive to violate the law by insider trading."); *see also SEC

v. Happ*, 392 F.3d 12, 32-33 (1st Cir. 2004) (affirming district court's decision to impose a one

time "civil penalty on Happ not only to punish him but to serve as a deterrent on insider trading

generally").

## I.      The Facts Demand Imposition of a Civil Penalty

A civil penalty is "intended to 'penalize the defendant for illegal conduct.'" *SEC v.

Sargent*, 329 F.3d 34, 42 (1st Cir. 2003).  The First Circuit's *Sargent* decision sets forth several

factors for assessing whether an insider-trader is deserving of such a penalty.  *Id.*  These factors

weigh heavily in favor of punishing Donovan:  his conduct was egregious, his conduct was not

isolated but a premeditated design to repeatedly violate his fiduciary duty, his substantial net worth was derived from the job he performed for the fiduciary clients from whom he stole this information, his actions involved concealment and evasion, and after commencement of the SEC's investigation, Donovan failed to respond honestly, in an effort to manipulate the civil enforcement process.  This collection of wrongful conduct compels the imposition of a civil penalty.

        A.        <u>Donovan's Illegal Conduct Was Egregious</u>

Donovan's violation struck at the heart of his fiduciary obligations to Fidelity and, more to the point, constituted a deliberate and conscious misappropriation of confidential information. Donovan testified that he agreed, as part of his employment agreement, to "keep Fidelity's confidential information confidential."  Trial Transcript, 11/16/09 (2d Sess.) 9:25-10:3.  He was aware that the AS400 information was not released to the public, and that it was password-protected.  *Id*. 10.  Donovan knew that he was allowed to see the information to do his job -- trading for the Fidelity Funds -- and that he was not allowed to release it for any other purpose. *Id.*  And Donovan knew that he was not supposed to give out information from the AS400 to his family and friends for their personal trading.  *Id*. 11.  The jury found, by its answer to question 1 on the verdict form, that Donovan did just that.  This violation was indisputably deliberate, given Donovan's knowledge (and sworn testimony) that he was not allowed to do it.   And it was flagrant, as evidenced by the testimony (from K.C. Smith and David Hinkle) that Donovan not only passed on the nonpublic information, but bragged about it.

B.      Donovan's Illegal Conduct Was Repeated and Not Isolated

Donovan's access of Covad data and direction of trading in his mother's brokerage account occurred over *at least* three days, August 4 through August 6, 2003.  Over these three days, Donovan did not commit a simple crime of opportunity.  For three days, he repeatedly accessed a Fidelity database for the purpose of stealing the very data that he had promised to protect; from a database that he knew to be carefully controlled to prevent theft of information. Then he passed that information, through multiple phone calls, to his mother.  These repeated actions required planning and coordination, showing a premeditated design to steal from his fiduciary clients and willfully violate the securities laws.

C.      The Source of Donovan's Wealth Was The Clients From Whom He Stole

In the final full year of his employment at Fidelity, Donovan made approximately a million dollars in salary and bonus.  *See* Exhibit A, Excerpts of David Donovan Deposition (Donovan Depo.) 79:4 to 80:6.  This salary and bonus was supported by the fees paid by Fidelity's clients (ordinary investors and retirement plans).  When Donovan stole the Covad trading information from the AS400 and gave it to his mother for her enrichment, Donovan was stealing from the very same clients who paid the fees necessary to support his generous salary and bonuses.[2]  Donovan's theft did not come merely at the expense of Fidelity, which ran the mutual funds, but also at the expense of the ordinary investors who owned those funds.

---

[2] The Commission also notes that Donovan's opposition brief does not provide any financial statement or proof of an inability to pay a civil penalty.

D.      Donovan Concealed His Actions By Trading Through His Mother's Account

As the evidence showed at trial, Fidelity put in place several safeguards to ensure that its

Access Employees (those with access to its mutual fund trading data) would not use that

information for personal or third-party benefit.  In addition to the applicable ethical rules, those

safeguards included: (1) requiring Access Employees to keep their brokerage accounts at

Fidelity; and (2) requiring Access Employees to pre-clear their personal securities trades.

Donovan -- well-aware of the restrictions -- evaded these safeguards and passed the material,

non-public information to his mother for her to use.  This is not a simple case of

misunderstanding, where Donovan thought he could pass the information to his mother but was

later proved wrong.  Instead, Donovan knew and believed he was responsible for his mother's

trades because, as K.C. Smith testified at trial, Donovan bragged about the fact that he had gotten

Covad through his mother's account.  Frustrated that he could not trade in his own account,

Donovan deliberately breached his fiduciary duty to Fidelity by bypassing the Fidelity rules and

causing his mother to buy the stock.  This behavior constitutes concealment, just as if Donovan

had traded through an account he held at another institution.  The outcome is the same: he used

the AS400 information to cause purchases of Covad stock.

E.      Donovan Did Not Respond Honestly To Authorities

In 2005, Donovan appeared at the Commission to provide sworn investigative testimony

about his knowledge of his mother's trading.  At the time, Donovan stated that (1) he did not

know whether his mother traded on-line; (2) he had no idea whether his mother or his father was

the one making securities trades; and (3) he had absolutely no knowledge of what his mother was

doing in her brokerage account.  *See* <u>Exhibit B</u>, Excerpts of David Donovan Investigative

Testimony, 358:8 to 359:6.  At trial, Donovan changed his tune.  He told the jury a completely

different story about talking to his mother while she was trading online and directing her to call

the help desk.  Trial Transcript, 11/16/09 (1st Sess.) 55:4 to 61:22.  These two stories cannot be

reconciled, as was shown by his impeachment at trial.  *Id.* 67:12 to 73:6.  These facts devastated

Donovan's credibility with the jury.  More importantly for this proceeding, however, they show

how Donovan tried to manipulate the civil enforcement process by changing his explanation in

an attempt to deal with the Commission's incriminating evidence.  Such an abuse of civil process

should weigh heavily in favor of imposing a civil penalty.  *See SEC v. Drucker*, 528 F. Supp.2d

450, 452-54 (S.D.N.Y. 2007) (imposing civil penalty of twice the sum of profits where defendant

failed to cooperate in investigation and committed perjury on witness stand).

## II.    A Permanent Injunction Is Appropriate

In opposing the imposition of a permanent injunction, Donovan contended, in essence,

that an injunction was not necessary, since he would not be in a position to obtain "inside

information" because he is now a consultant instead of a trader.  The Court's judgment, entered

yesterday, granted no injunction.  For the reasons set out below, the SEC submits that an

injunction is appropriate and warranted.

### A.    <u>Donovan still has access to material, nonpublic information</u>

Donovan's change of role has not decisively removed his access to confidential securities

information.  Donovan is currently employed by Sapient Consulting, where he provides

consulting services to the financial services industry.  *See* <u>Exhibit A</u>, Donovan Depo., 4:16 to

6:21.  At deposition, Donovan explained that he works with Wall Street investment banks,

including Merrill Lynch and Citigroup, in selling Sapient's products and consulting services.

After answering only a handful of questions concerning his employment with Sapient, Donovan

declined to answer any more, citing a concern about confidential information he may possess.

*Id.* 6:22 to 11:13.  But publicly available information makes it clear that Sapient provides

consulting and software design services that work intimately with its clients' confidential

securities trading information.  For example, Sapient's website explains:  "Sapient works with

global investment banks, asset management companies, trading firms, and hedge funds to

improve their trading business, transform their operations, expand their client bases, and

maximize profitability."  *See* Exhibit C, Why Partner With Sapient?, A Powerful Interplay of

Design and Data, viewable at http://edge.sapient.com/assets/ImageDownloader/148/

sapient_net_3.5.pdf (viewed 1 Dec 09).  With regard to securities trading operations in

particular, Sapient's services include assisting clients in the transformation of "front-, middle,

and back-office operations."  *See* Exhibit D, Consulting/Services/Industries We Serve/Financial

Services, "Rich in Ideas," viewable at http://www.sapient.com/en-

us/Consulting/Services/Industries-we-Serve/Financial-Services.html (accessed 2 Dec 09).  Based

on this public information, it appears that Donovan, as a securities trading industry consultant,

still has access to confidential securities trading information through his employer (Sapient),

which works with this data for the purpose of improving its clients' trading operations.  David

Donovan is again in a position of trust and confidence, exactly as he was when he took

advantage of Fidelity's and its shareholders' material, nonpublic trading information.  The

danger now is the same as the danger then: that he will use this information for personal gain,

rather than to serve his employer and its clients.

B.      Donovan has not expressed remorse, nor admitted wrongdoing

Donovan has steadfastly refused to acknowledge the wrongfulness of his conduct.

Indeed, contrary to the jury's finding, Donovan testified that he did not provide his mother with

Fidelity's material, non-public mutual fund trading information.  This failure to accept

responsibility is a factor that weighs in favor of an injunction.  See *SEC v. Manor Nursing Ctrs.*,

458 F.2d 1082, 1100 (2d Cir. 1972) ("the fact that appellants continued to maintain their past

conduct was blameless was a factor appropriately considered by the district court").  "[T]he court

may properly view a culpable defendant's continued protestations of innocence as an indication

that injunctive relief is advisable."  *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996); *see also*, *SEC

v. Murphy*, 626 F.2d 633, 656 (9th Cir. 1980); *SEC v. Jakubowski*, No. 94-C-4539, 1997 WL

598108, at *1 (N.D. Ill. Sept. 11, 1997), *aff'd*, 150 F. 3d 675 (7th Cir. 1998), *cert. denied*, 525

U.S. 1103 (1999).  "Such 'persistent refusals to admit any wrongdoing' strongly suggest that

violators of the securities laws will not refrain from violations in the future absent an injunction."

 *SEC v. Downe*, 969 F. Supp. 149, 157 (S.D.N.Y. 1997), *aff'd*, *SEC v. Warde*, 151 F.3d 42 (2d

Cir. 1998).

## III.    Conclusion

As it stands, the judgment addresses the serious violation Donovan committed by

directing him to pay back what he took, and nothing more.  It does not hold Donovan

accountable for his abuse of the civil enforcement process and his unwillingness to accept

responsibility for his illegal conduct, nor will it serve as a deterrent to future violations, either by

Donovan or by others.  The SEC submits that Donovan committed a heinous violation, breaching

the trust placed in him by his employer and its clients, taking advantage of a privileged position

to violate the laws that are supposed to level the playing field for all investors.  Donovan's

current position appears to afford continued opportunities to commit similar violations.

Accordingly, the SEC respectfully requests that the Court reconsider and amend the judgment to

require the payment of a civil penalty in the amount of up to three times the disgorgement

amount, or $269,325, require payment of prejudgment interest in the amount of $39,283, and

further enter a permanent injunction as requested in the SEC's Motion for Entry of Judgment.  In

light of the record, civil justice requires punishment of this wrongdoer and protection of those

members of the public who might allow Donovan, either directly or through his employer, access

to their material, non-public information.

<div style="margin-left: 45%;">

Respectfully submitted,

**Plaintiff:**

  /s/ R.M. Harper II
Richard M. Harper II (BBO No. 634782)
Rachel E. Hershfang (BBO No. 631898)
U.S. SECURITIES AND EXCHANGE
COMMISSION
33 Arch Street
Boston, Massachusetts 02110-1424
HarperR@sec.gov, Hershfangr@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission

</div>

Dated:  December 3, 2009

<div style="text-align: center;">

CERTIFICATE OF SERVICE

</div>

     I, Richard M. Harper II, hereby certify that on December 3, 2009, I caused a true copy of the foregoing document to be filed through the ECF system, and accordingly, the document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 3, 2009        /s/ Richard M. Harper II